**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

Civil Action No. 17-cv-0458-MSK

**SHARON J. SHELTON,**

    Plaintiff,

v.

**COMMISSIONER, Social Security Administration,**

    Defendant.

---

**OPINION and ORDER**

---

**THIS MATTER** comes before the Court on Plaintiff Sharon J. Shelton's appeal from the Commissioner of Social Security's (the "Commissioner") final decision denying her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§1381-83c. Having considered the pleadings and the record, the Court

**FINDS** and **CONCLUDES**

**I.    Jurisdiction**

Ms. Shelton filed a claim for disability insurance benefits pursuant to Titles II and XVI in October 2013, asserting that her disability began approximately two months earlier. After her claim was initially denied, Ms. Shelton filed a written request for a hearing before an Administrative Law Judge (the "ALJ"). This request was granted, and a hearing was held in August 2015.

The ALJ's Decision applied the five-step social security disability claim evaluation process and determined: (1) Ms. Shelton had not engaged in substantial gainful activity after August 1, 2013; (2) she had the severe impairments of bipolar disorder, provisional borderline personality disorder, and anxiety-related disorder; (3) she did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpt. P, App'x 1; (4) Ms. Shelton had the residual functional capacity ("RFC") to perform the full range of work at all exertional levels as set forth in 20 C.F.R. § 416.967(b)[1] with various limitations related to her ability to understand and remember instructions and interact with others; (5) she could not perform jobs that she previously held (network control operator and phlebotomist); but (6) there are jobs in the national economy suitable for an individual with Ms. Shelton's RFC, such as general clerk, file clerk II, and housekeeper. Based on this Step 5 conclusion, the Decision determined that Ms. Shelton was not and had not been disabled under the Social Security Act, and it denied her application for benefits.

The Appeals Council denied Ms. Shelton's request for review of the Decision, making the Decision the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011). Ms. Shelton's appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 42 U.S.C. § 405(g).

---

[1] All references to the Code of Federal Regulations (C.F.R.) are to the 2015 edition, which was the version in effect at the time of the ALJ's decision. Hereafter, the Court will only cite the pertinent Title II regulations governing disability insurance benefits, found at 20 C.F.R. Part 404. The corresponding regulations governing supplemental security income under Title XVI, which are substantively the same, are found at 20 C.F.R. Part 416.

## II. Relevant Material Facts

Ms. Shelton submitted her application for social security benefits on October 10, 2013, claiming an onset of disability of August 1, 2013. Ms. Shelton has suffered from various undiagnosed mental disorders for many years, and in or around March 2013, she was diagnosed with bipolar disorder, post-traumatic stress disorder ("PTSD"), and possible borderline personality disorder.

Until then, Ms. Shelton had engaged in a long working career, first as an IT technician, and then as a phlebotomist at Penrose Hospital. Shortly after her diagnosis, Ms. Shelton's employment was terminated. Ms. Shelton asserts that this termination was a triggering event for worsening of her mental disorders, preventing her from returning to gainful employment.

Ms. Shelton was hospitalized four times between September 2013 and October 2014; each hospitalization was the result of severe depression and suicidal ideation (and one apparent suicide attempt). She has suffered from frequent depressed moods, hypomanic episodes, increasingly severe memory problems, severe concentration problems, and liver dysfunction (non-alcoholic cirrhosis, which may or may not have contributed to her memory problems).

Ms. Shelton reports experiencing significant inability to control her emotions, especially including a tendency to become irrationally angry over seemingly minor incidents. She says that she can be hostile, paranoid, argumentative, and socially inept. She states that her longtime girlfriend's adult children do not like for her to be around their young children because she will become enraged over little things like the children spilling food or drink. Ms. Shelton also reports an extremely poor memory, possibly due to her liver condition, sleep apnea and/or PTSD. She says that she must be reminded to do laundry, bathe and generally take care of her personal hygiene needs. She says that she rarely cooks, because when she does, she often leaves the food

to burn on the stove or in the oven. She also reports going to the grocery store to shop but then forgetting why she is there. Ms. Shelton says that her girlfriend has to assume care of her pets because she would forget to let them in and out. While Ms. Shelton is able to drive, she reports frequently getting lost and forgetting where she is.

In February 2014, while in a manic episode, Ms. Shelton went on a spending spree, purchasing plane tickets to Europe, a 73-inch big screen television, and an eighteen-foot boat. Instead of going to Europe in February 2014, Ms. Shelton traveled by herself to El Paso, Texas, where her mother and brother lived. She testified that she had a blackout while driving and found herself in El Paso without any recollection of how she got there. With respect to the boat, Ms. Shelton was unable to learn how to operate it, and her sole attempt to use it resulted in a in her striking another craft and almost crashing into a pile of rocks. The Court further notes that there is medical evidence in the record that seemingly-irresponsible spending sprees are a common behavior in people with bipolar disorder who are experiencing a manic or hypomanic episode.

**Treatment records**

There are extensive treatment records from February 2013 through July 2015, including four hospitalizations in September 2013, March 2014, April 2014, and September/October 2014. Ms. Shelton was treated by Dr. Elliot Cohen, M.D., in March and April 2013, at which time she was diagnosed with bipolar disorder and hypomania. She was prescribed lithium, and appeared to be responding well to the medication. She then received care for her bipolar disorder through Colorado Springs Health Partners, P.C. Medical records generally indicate that she was able to use the lithium to manage her condition, at least in the 2013 time period.

However, in September 2013, approximately six weeks after her termination at Penrose Hospital, Ms. Shelton was hospitalized on an inpatient basis after reporting severe depression and suicidal thoughts.  Ms. Shelton was hospitalized for three days, then released for outpatient treatment.  Her lithium prescription was not altered, but an additional antidepressant was prescribed.

Ms. Shelton began treatment with Rocky Mountain Counseling Center for her bipolar diagnosis after her discharge from the hospital in September 2013.  She was treated by psychiatrist, Dr. Jeffrey Harazin, M.D.  He diagnosed her as suffering from PTSD, and prescribed Lamictal.  Ms. Shelton met regularly with Dr. Harazin from November 2013 through June 2014, and once every few weeks from November 2014 through mid 2015.  In November 2013, due to her depression, he increased the prescribed Lamictal dosage.  Then, in January 2014, Dr. Harazin changed Ms. Shelton's antidepressants due to side effects.  In February 2014, Ms. Shelton reported still feeling depressed, but indicated some improvement; she also reported that the new antidepressant was causing her to experience anger issues, and Dr. Harazin discontinued it and increased her prescribed dosage of Lamictal.  By the end of March, Dr. Harazin's treatment notes reflect that Ms. Shelton reported "feel[ing] good" and maintaining a continued euthymic mood.  However, by April 2014, Ms. Shelton told Dr. Harazin that she was experiencing mood deterioration, and there is some indication in his notes that she had stopped taking her medication.

By the end of April 2014, Ms. Shelton was hospitalized again for suicidal ideation.  This hospitalization followed her trip to El Paso where she says that she blacked out.  She reported that she had stopped taking her Lamictal and had become irritable, agitated and aggressive.  At the hospital, she was started on Latuda.  Ms. Shelton was stabilized and discharged on April 25,

2014, and resumed treatment with Dr. Harazin. On April 30, 2014, his notes reported a euthymic mood. On May 29, 2014, she reported that the Latuda was causing her to develop rage, and it was discontinued. She also complained of anxiety but refused any medications to treat that. Dr. Harazin again reported a euthymic mood but noted that Ms. Shelton appeared anxious. Dr. Harazin also prescribed Trileptal. In June 2014, Dr. Harazin's notes reflect that Ms. Shelton had stopped taking the Trileptal but agreed to restart it. Later that month, another entry in the notes indicates that Ms. Shelton was complaining of depression, and she agreed to increase the Trileptal dosage. A June 26, 2014 entry notes that Ms. Shelton seemed "much improved" with a euthymic mood, and that the only real symptom she was experiencing was her memory problems, which possibly or even likely were attributable to her liver condition. The note indicates that Dr. Harazin believed she was responding to her medications.

However, in July 2014, Ms. Shelton reported to Dr. Harazin that she had misrepresented her mental status at the previous session, and in fact, she was very depressed and her medications were no longer working. Dr. Harazin ordered an increased dose and prescribed additional medications. In August 2014, Dr. Harazin's treatment notes reflect that Ms. Shelton reported that she was doing "okay," but she had experienced a stressful trip to San Diego to visit family.

In September 2014, Ms. Shelton was hospitalized at Memorial Hospital (again) after an apparent suicide attempt. She was hospitalized for five days, and she reported suicidal ideation and depression triggered by her relatively recent liver diagnosis. Hospital records described her condition as "despondent," and Ms. Shelton expressed that she would attempt suicide again if given the chance. She was discharged on September 27, 2014. She saw Dr. Harazin a few days after discharge; his treatment notes reflect that at this time Ms. Shelton was completely unmedicated due to her liver problem (it was possible that metabolizing most medications could

cause her further liver damage). In December 2014, Dr. Harazin replaced her prescribed medications with Prozac in response to Ms. Shelton's complaints of continued depression. Medical records indicate that Ms. Shelton continued treatment with Dr. Harazin throughout the first half of 2015, and her complaints of depression generally continued, with Dr. Harazin frequently adjusting the dosages and prescribed medications to treat that depression.

**Opinion of Ms. Shelton's Treating Physician:**

Ms. Shelton's sole treating source opinion is from Dr. Harazin, who submitted a Medical Source Statement dated July 14, 2014. Along with this form, Dr. Harazin submitted his treatment notes for Ms. Shelton (discussed at length above).

In the Medical Source Statement, Dr. Harazin noted Ms. Shelton's diagnoses of bipolar disorder and PTSD, and indicated that those manifested in a host of symptoms (difficulty concentrating, thoughts of suicide, *etc.*). Her bipolar disorder is characterized as "poorly controlled," and it notes that "[s]he can get so euphoric that she acts bizarrely." Dr. Harazin recorded that Ms. Shelton's condition precludes her from having the mental abilities and aptitudes needed for her to do work for ten to twenty percent of the workday (depending on the particular mental aptitude or ability – *e.g.*, understanding simple instructions, understanding detailed instructions, performing at a consistent pace, *etc.*), and that virtually any type of workplace stress will exacerbate Ms. Shelton's level of impairment with respect to those mental abilities and aptitudes. Dr. Harazin assesses her as having marked functional limitations in restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner, and that she cannot handle normal work stress.

**Opinion of Examining, Consulting Psychologist:**

The Commissioner also obtained the opinion of a consulting psychologist (Dr. Marten) who examined Ms. Shelton. Dr. Marten evaluated Ms. Shelton on February 19, 2014. He conducted a clinical interview and administered a mental status examination. After going through her detailed history, Dr. Marten noted that Ms. Shelton had difficulty with basic math- and arithmetic-based tasks, which indicated marked-to-severe impairment in her ability to concentrate and carry out more complex instructions in the workplace (and moderate-to-marked difficulty in carrying out simple tasks). Dr. Marten also found that Ms. Shelton had severe limitations with respect to auditory recall, which suggests similar limitations in her ability to consolidate and retrieve pertinent auditory information in workplace settings. Ultimately, Dr. Marten concluded that Ms. Shelton presented with a relatively stable level of psychosocial functioning, with no improvement or deterioration in the past month relative to the past year.

**Opinion of Non-Examining, Consultative Psychologist:**

Dr. Gayle Frommelt, Ph.D. reviewed Ms. Shelton's records in February 2014 (before three of the four hospitalizations and without Dr. Harazin's records in 2014 and his Medical Source Statement). Dr. Frommelt also had Dr. Marten's opinion which generally found that Ms. Shelton had moderate-to-marked difficulties in understanding and carrying out instructions and tasks in workplace settings. Dr. Frommelt opined that Ms. Shelton had: 1) mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence and pace, and 2) moderate limitations in a in understanding, remembering and carrying out instructions, maintaining attention and concentration for extended periods, working in coordination with or in proximity to others

without being distracted, completing a normal workday or workweek without disruption from symptoms of mental disorder, interacting appropriately with the general public, accepting instructions and respond to criticism from supervisors, getting along with coworkers or peers, responding appropriately to changes in the work setting, and setting realistic goals or make plans independently of others.

Dr. Frommelt opined that Ms. Shelton's condition was well-controlled with medications and that Ms. Shelton's reports of her symptoms were only "partially credible." She criticized Dr. Marten's opinion as based on a single examination and not representative of Ms. Shelton's reported functioning. Ultimately, Dr. Frommelt concluded that Ms. Shelton "retains the ability to do work of limited complexity that could be learned in three months time. She can manage social interactions that are not frequent or prolonged."

**The ALJ's Decision**

In the Decision, the ALJ gave great weight to the opinion of Dr. Frommelt, and no weight to the opinions of Dr. Harazin and Dr. Marten. The Decision explains that Dr. Harazin's opinion was not entitled to controlling weight as a treating source opinion for three reasons: 1) his opinion (mostly) is given through a "check the box" type of form; 2) his opinion is inconsistent with his treatment notes, and specifically the entry made on June 26, 2014 just prior to his July 14, 2014 Medical Source Statement and 3) there is substantial nonmedical evidence of Ms. Shelton engaging in activities and tasks that would be inconsistent with the marked limitations found by Dr. Harazin. The activities that the ALJ found inconsistent were living independently, caring for pets, maintaining a driver's license and driving, handling money and paying bills, traveling, purchasing a boat and attempting to use it, and interacting with the staff at a fast food restaurant when dissatisfied with the food.

9

The Decision gives no weight to Dr. Marten's opinion as well.

**Evidence submitted on appeal**

Ms. Shelton appealed the Decision to the Appeals Council, and submitted a sworn statement from Dr. Harazin.[2] In it, Dr. Harazin explained his opinion concerning Ms. Shelton's marked difficulties at length. He explained that Ms. Shelton's purchase of expensive items – such as the boat and plane tickets to Europe – likely was caused by hypomanic episodes, in which she spent indiscriminately and that when Ms. Shelton went to Germany, she merely walked off a plane and to her lodging, and then slept most of the day for the duration of the trip rather than sightseeing or engaging in other tourist type activities. He also elaborated on her functional limitations, opining that her memory problems were so severe that it is unlikely that she could remember even the simplest of instructions at the workplace, and even if she could, she easily could become physically aggressive in the face of criticism from a supervisor. With respect to the point that Ms. Shelton's condition seems to respond to medication, Dr. Harazin explained that medication noncompliance is part of her illness, because something will trigger her PTSD, she will become depressed, and then stop taking the medications because she feels that they are not working. He concluded by opining that Ms. Shelton would completely unable to adapt to changes in the workplace setting.

---

[2] Information submitted to the Appeals Council in conjunction with an appeal of an ALJ's decision generally becomes part of the record on appeal to a district court, and it may be considered, even though the information was not considered by the ALJ. *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). While it certainly is best practices for a claimant to submit evidence as early as possible in the application process, the Appeals Council stage of that process constitutes "an administrative decision to give a claimant a last opportunity to demonstrate disability before the decision becomes final," and as such, all evidence in the administrative record can be considered upon judicial review. *Id.* As such, the Court considers Dr. Harzain's rebuttal statement as part of the record.

10

The Appeals Council found that the newly submitted evidence by Dr. Harazin's was not sufficient to warrant reversal of the Decision, and thus adopted the Decision as the final decision of the Commissioner.

## III. Discussion

Ms. Shelton asserts four principal arguments in her appeal. First, she contends that the Decision improperly failed to give controlling weight to the opinion of her treating psychiatrist, Second, she asserts that the Decision improperly gave undue weight to the opinion of a non-examining, non-treating source and no weight to the opinions of Ms. Shelton's treating psychiatrist and an examining, consultative psychologist. Third, Ms. Shelton argues that the Decision improperly gave no weight to third-party statements submitted on behalf of Ms. Shelton. Fourth, Ms. Shelton argues that it was an error for the Appeals Council not to remand the matter to the ALJ to consider new evidence submitted after the Decision was issued. Because the first argument is dispositive and requires remand, the Court will focus on it.

### A. Standard of review

Although the Court's review is *de novo*, the Court must uphold the Commissioner's decision if it is free from legal error and the Commissioner's factual findings are supported by substantial evidence. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). Substantial evidence is evidence a reasonable person would accept to support a conclusion, requiring "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The Court may not reweigh the evidence, but it looks to the entire record to determine if substantial evidence exists to support the Commissioner's decision. *Wall*, 561 F.3d at 1052. If the ALJ failed to apply the correct legal standard, the decision must be reversed,

regardless of whether there was substantial evidence to support factual findings. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

The record in this matter includes information submitted to the Appeals Council. *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). Therefore the Court considers Dr. Harzain's second statement as part of the record.

### B. Weight given to Ms. Shelton's treating physician opinion

Ordinarily, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record. *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007), 20 C.F.R. § 404.1527(c)(2).[3] As explained in *Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003):

> The analysis is sequential. An ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." If the answer to this question is "no," then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record.

*Id.* at 1299. If both prongs of this test are met, the treating physician's opinion is given controlling weight over all contrary opinions. To give a treating provider's opinion less than controlling weight, the ALJ must give specific and legitimate reasons. *Drapeau v. Massanri*, 255 F.3d 1211 (10th Cir. 2001); *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

If a treating physician's opinion is not afforded controlling weight, the ALJ must then proceed to weigh the opinions of *all* medical providers, both treating and consultative. The

---

[3] Pursuant to a change in the Social Security Administration's regulations, effective March 27, 2017, treating physician opinions will no longer be given controlling weight. However, the prior rule remains applicable to disability claims – like Ms. Shelton's – filed before that date. *Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P*, 2017 WL 3928298, at *1 (2017).

12

comparative assessment requires consideration of several factors: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors, such as the physician's familiarity with Social Security standards and the extent to which the physician examined other medical records in reaching his or her conclusions. *Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016), 20 C.F.R. § 404.1527(c)(1)-(6). A consulting examiner's opinion is presumptively entitled to more weight than an opinion derived from a review of the records. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012). The ALJ may dismiss or discount an examining physician's opinion but must do so based on the foregoing factors and must provide specific, legitimate reasons for doing so. *Id*. Those reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

The ALJ determined that Dr. Harazin's July 14, 2014 opinion was not entitled to controlling weight, and, gave it no weight whatsoever. It is clear from the Decision that the ALJ did not engage in the two-step process necessary to determine whether Dr. Harazin's opinion was entitled to controlling weight. This was legal error. However, it is harmless if the reasons given for rejecting his opinion satisfy either of the grounds for giving his opinion less than controlling weight.

13

The Decision three reasons for rejecting Dr. Harazin's opinion: (1) the opinion was expressed on a "check-the-box" form that gave Dr. Harazin little opportunity to offer a narrative to explain his opinion; (2) the opinion was inconsistent with his treatment notes, which appear to indicate that Ms. Shelton was improving and responding to medication in the handful of sessions prior to submission of the opinion; and (3) it was inconsistent with substantial evidence in the record that Ms. Shelton was engaged in various activities (travel, purchasing a boat, *etc.*) that show greater functional skills than Dr. Harizan indicated for her. Only the second and third reasons arguably reach to the level of a finding that Dr. Harizan's opinion is inconsistent with the substantial evidence in the record.

Of the three justifications, the Commissioner defends only the second, and the Court understands the Commissioner to agree that the first and last rationale are unsupported, but nevertheless sets out its assessment in a footnote below.[4]

---

[4] As to the first rationale, there is no hard and fast rule that the use of a "check-the-box" form will automatically disqualify a treating physician's opinion from receiving controlling weight. *Andersen v. Astrue*, 319 Fed. App'x 712, 723 (10th Cir. 2009). This is especially true where – as here – the "check-the-box" report is accompanied by extensive treatment notes and other medical records from that provider documenting his treatment and supporting the particular boxes checked. *Id.*

As to the last rationale, Court agrees with Ms. Shelton that her activities are not inconsistent with the limitations observed by her psychiatrist. The Decision primarily cites the travel undertaken by Ms. Shelton, asserting Dr. Harazin "did not reconcile her ability to plan and travel to these places [El Paso, San Diego and Germany], with no increased symptoms or emergency plan in place." This argument is misplaced for multiple reasons. First, there is no evidence in the record that Ms. Shelton planned those trips. Indeed, at least with one of her trips to El Paso, the evidence is that it occurred during a blackout and was wholly unplanned, and Ms. Shelton apparently just found herself in that city without knowing how she got there. Second, as noted by Dr. Harazin in his second statement, it does not take much functional ability to travel to an airport, walk on a plane, fly to a destination, walk off of the plane, and then transport oneself to new lodgings. This is especially true when the individual in question is accompanied on the trip, or is meeting family at the destination, as apparently was the case for all of the trips in question.

The notion that an individual with severe bipolar disorder who can travel must also be free of the marked functional limitations found by Dr. Harazin simply misunderstands the nature

That takes the Court to focal argument stressed by the Commissioner – that Dr. Harazin's opinion is inconsistent with his treatment notes, which reflect that Ms. Shelton's condition was improving and responding to her medication immediately prior to his submission of that opinion. The treatment note for the last session with Dr. Harazin (dated June 26, 2014) prior to his July 14, 2014 opinion states that Ms. Shelton appeared (or reported) to be "[m]uch improved," and that she only complained of memory problems, that she exhibited a euthymic mood, and hat she appeared to be "responding to meds."

But this note is a snapshot in time; it does not represent the longitudinal record of the period over which Dr. Harazin treated Ms. Shelton. For example, the two treatment notes preceding the June 26, 2014 one (dated June 12, 2014 and June 18, 2014) reflect phone calls in which Ms. Shelton was still complaining of depression and side effects from her medications, and Dr. Harazin was forced to change her prescribed medications and/or dosages. The treatment

---

of that disorder. Courts have often observed that a bipolar disorder is episodic. *See, e.g., Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). Frequently, it presents as episodes of mania or hypomania punctuated by periods of depression or even relatively stable moods. Furthermore, bipolar disorder often can be controlled to some degree with medication, but even then, individuals suffering from bipolar disorder frequently demonstrate poor compliance with their medication regime. *See, e.g., Howard v. Astrue*, No. CIV-09-614-L, 2010 WL 1372662, at *6 n. 2 (W.D. Okla. Mar. 9, 2010). The fact that Ms. Shelton apparently was able to travel on a handful of occasions does not preclude the finding that when she experiences manic or depressive episodes, she has marked functional limitations that preclude her from working.

     Other evidence that is characterized the Decision as inconsistent with Dr. Harazin's opinion is also consistent with bi-polar behavior. For example, the Decision notes that in February 2014, Ms. Shelton made a number of large purchases (a boat, a large-screen television, *etc.*) which exemplifies excessive and/or irresponsible spending that often occurs in a manic phase. The Decision also mischaracterizes several other pieces of evidence. For example, it cites the purported fact that Ms. Shelton can cook for herself, but the evidence in the record suggests that she normally does not do so because she often forgets what she is doing and leaves the food on the stove or in the oven to burn. Similarly, the Decision asserts that she has pets for which she cares, but the evidence on this point is that her girlfriend was forced to take over care for those pets after Ms. Shelton forgot to let them in during a snowstorm.

note for the in-person visit on May 29, 2014 shows Ms. Shelton was complaining of "rage" caused by one of her medications, and although she displayed a euthymic mood, she complained of anxiety and displayed signs of being anxious. The treatment note on April 30, 2014 reflects that Dr. Harizan increased her prescribed dosage after she had been discharged from the hospital after being admitted on an inpatient for complaints of depression and suicidal ideation. Thus, contrary to the Decision's characterization, the treatment notes in the few months prior to the July 14, 2014 opinion certainly do not paint an unambiguously rosy picture of improvement for Ms. Shelton.

In addition, the otherwise-positive June 26, 2014 treatment note indicates that Ms. Shelton was still complaining of memory problems. As Dr. Harazin explained in his rebuttal statement, to a large degree, many of Ms. Shelton's functional limitations can be traced back to her poor memory (which, he speculates, is at least partially attributable to her PTSD). There is evidence that she constantly forgets all but the simplest instructions that are not written down for her, which could prevent her from working at most or all jobs. It is not clear to the Court that even if the June 26, 2014 treatment note reflected a sustainable stabilization of Ms. Shelton's condition, that it would be inconsistent with Dr. Harazin's opinion, given that she still was experiencing the severe memory problems that he believes would keep her from working.

Finally, and most importantly, bipolar disorder is an episodic condition, meaning that an individual might be relatively "fine" at one point in time, but severely functionally limited at another. This ebb-and-flow nature of the disorder can be exacerbated by medication compliance issues. And indeed, the evidence in this case – specifically including Dr. Harazin's treatment records – demonstrates that Ms. Shelton experienced problems with both of those phenomena. With respect to the former, Dr. Harizan's treatment records are replete with treatment notes

16

reflecting that Ms. Shelton would appear to improve one month, and then get worse only in the next. For example, the treatment note for the July 31, 2014 session, held immediately after the June 26, 2014 one that the Commissioner relies upon so heavily, reflects that Ms. Shelton told Dr. Harazin that she had lied about doing better in her prior appointment, and that, in fact, she was severely depressed, and her medications were no longer working. She would be hospitalized after a suicide attempt (attempted overdose) less than two months later.

Viewed comprehensively and longitudinally, Ms. Shelton's treatment record shows no reliable improvement or stability in her condition – to the contrary, her mood, judgment, skills, and abilities were constantly fluctuating, as is common with a bi-polar disorder. As a consequence, the Decision's reliance on a single "stable" moment in Ms.Shelton's life to find Dr. Harazin's opinion not supported by substantial evidence is unjustified. To the contrary, Dr. Harazin's opinion is consistent with substantial evidence in the record. As a consequence, the ALJ's legal error in giving his opinion controlling effect is not harmless – it constitutes reversible error. Because the error is legal error, it is not necessary to address the remainder of Ms. Shelton's contentions.

For the forgoing reasons, the Commissioner of Social Security's decision is **REVERSED** and **REMANDED.** The Clerk shall enter a Judgment in accordance herewith.

DATED this 30th day of March, 2018.

B**Y THE COURT:**

*/s/ Marcia S. Krieger*

Marcia S. Krieger
United States District Judge